STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Paul D. HOPPE, Defendant-Respondent.

Supreme Court

*No. 00–1886–CR. Oral argument December 6, 2002.—Decided May 22, 2003.*

2003 WI 43

(Also reported in 661 N.W.2d 407.)

297

For the plaintiff-appellant-petitioner the cause was argued by *James M. Freimuth,* assistant attorney general, with whom on the briefs was *James E. Doyle,* attorney general.

For the defendant-respondent there was a brief and oral argument by *William E. Schmaal,* assistant state public defender.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, State of Wisconsin, seeks review of an unpublished court of appeals decision affirming the circuit court's order granting Paul Hoppe's motion to suppress statements he made to police officers during their investigation of the death of Jacqueline Simon, Hoppe's girlfriend.[1] The State argues that the court of appeals erred in giving undue weight to Hoppe's condition when it concluded that Hoppe's statements were involuntary. We agree with the court of appeals that the circuit court's findings as to Hoppe's condition were not clearly erroneous and that, under the totality of the circumstances, Hoppe's statements were involuntary. Accordingly, we affirm.

I

¶ 2. On Saturday, March 6, 1999, shortly after 6:00 p.m., police were dispatched to Paul Hoppe's apartment to investigate a death. The police found Hoppe

---

[1] *State v. Hoppe,* No. 00–1886–CR, unpublished slip op. (Wis. Ct. App. June 28, 2001) (affirming an order of the circuit court of Columbia County, Richard Rehm, Judge).

sitting in the living room with Jacqueline Simon's body on the floor next to him. Simon was Hoppe's girlfriend. Hoppe appeared to be in poor physical condition. He was shaking and was unable to walk on his own. Initially, because of Hoppe's long history of alcohol abuse, they thought he was intoxicated.

¶ 3. Hoppe was transported to the hospital but was not placed under arrest. Blood tests at the hospital indicated that he was not intoxicated. Rather, it was determined that Hoppe was suffering the effects of severe alcohol withdrawal. Captain Kevin Manthey, the officer in charge of the investigation, who had known Hoppe for 25 years, asked and received permission from Hoppe for an interview.

¶ 4. Prior to the interview, a physician prescribed Librium to control possible delirium tremors. However, the police asked a nurse who was preparing to administer the medication whether she could hold off the medication so they could interview Hoppe. The nurse was concerned about withholding the Librium, but she wanted to cooperate with the officers and thought it would be appropriate to delay administering the Librium as the police had requested.

¶ 5. Captain Manthey began the first interview with Hoppe at approximately midnight on March 6 and it ended about an hour and fifteen minutes later, at 1:14 a.m. on Sunday, March 7. This interview was tape-recorded. During this interview, Hoppe was confused about the date and gave confusing and conflicting statements about his whereabouts and the events of the previous couple of days. He denied harming Simon, and said that he found her dead at approximately 4:00 p.m. on Saturday. Hoppe also said that he had gone to a local tavern on Saturday afternoon and drank six beers. He

insisted that he drank the beer even though Captain Manthey told him his blood alcohol level was .00.

¶ 6. During this first interview, Hoppe agreed to submit to a "voice stress test." Hoppe had difficulty following the instructions for this test, repeatedly answering control questions truthfully when told to answer falsely, even though the officer gave him the actual false answers to repeat. After being told three times how to answer the questions, Hoppe finally answered the control questions falsely, as instructed.

¶ 7. The next morning at 9:00 a.m., Dr. Frederick Bronson, Hoppe's treating physician, saw Hoppe and diagnosed him as suffering from chronic alcoholism, alcohol withdrawal, threatened delirium tremors, dehydration, electrolyte imbalance, and chronic brain syndrome secondary to alcohol abuse. According to Dr. Bronson, Hoppe was confused and remained confused for the first three or four days of his hospital stay.

¶ 8. The police returned for a second interview with Hoppe at 2:15 p.m. on Monday, March 8. During the 37–hour interval between the first interview and the second, the police placed no restrictions on Hoppe, his visitors, or his medical care. Before beginning the second interview, the police did not talk with any medical personnel about his condition. The police reminded Hoppe that he had agreed they could come back and talk to him. Hoppe acknowledged that this was correct. When asked if he was taking any medications, Hoppe said "no" even though he was on Librium.

¶ 9. At the time of the second interview, police knew that Simon had died from a blow to the back of her head. They also believed that she may have died on Friday, the day before her body was found. In this second interview, which lasted an hour and forty-five minutes, the police asked Hoppe several questions

300

about what he and Simon had done on Friday evening and whether they had had an argument that night. He repeatedly denied that he had hit her or pushed her, and insisted that she was alive on Saturday morning. During this interview, Hoppe disavowed that he had consumed six beers on Saturday, but stated that he had consumed brandy Saturday morning. However, later in the interview he claimed that he had gone to a tavern and consumed six beers.

¶ 10.　This interview was also tape-recorded. The tape reflects that Hoppe's voice was slurred and that he spoke slowly with long pauses. The police acknowledged that at several points during the interview, Hoppe closed his eyes and did not answer. Captain Manthey believed that at least a few times when Hoppe closed his eyes, he actually fell asleep. Also, during this interview, it seems that Hoppe may have been experiencing hallucinations, for at one point Captain Manthey interrupted the interview to say, "There's no one else here, Paul."

¶ 11.　During this second interview, Dr. Timothy Hayes, a psychologist experienced in treating alcoholics, came to see Hoppe. The police told him to return later. Dr. Hayes did so at 5:00 p.m., approximately one hour after the police concluded the second interview. After reviewing Hoppe's chart and talking to him, Dr. Hayes noted that Hoppe was in a somewhat delirious state, in and out of consciousness, and had difficulty concentrating. He also concluded that Hoppe had short-term memory impairment and that his abstract reasoning, judgment, and problem-solving abilities were impaired. He determined that Hoppe was either hallucinating or was delusional.

¶ 12.　Hoppe's former wife visited Hoppe at 8:30 p.m. on March 8. She indicated that he was lethargic

301

and falling asleep. She also reported that his movements were delayed and his speech was slow.

¶ 13. Medical personnel noted that Hoppe was confused during the night of March 8 and March 9, though he was oriented to person, time, and place. However, on March 9 medical personnel reported that Hoppe remained confused.

¶ 14. The police returned to the hospital for their third recorded interview with Hoppe at approximately 2:00 p.m. on March 9. This interview lasted two hours. At the start of this interview, the police asked a nurse to put Hoppe in a chair so he would be better able to stay awake. It took two people to get Hoppe to his chair.

¶ 15. By this time, the police had determined that Hoppe was not at the local tavern at all on Saturday. Captain Manthey challenged Hoppe regarding his prior statements in that regard. After Manthey challenged him three times, Hoppe agreed that it was not the truth. Hoppe stated that he told them that because he needed an alibi.

¶ 16. Later during this interview, Hoppe said he could not remember whether some of the details he had previously told the officers about his and Simon's activities were truthful. When Manthey told Hoppe that it appeared that Simon had been dead all day on Saturday, and may have died on Friday, Hoppe initially reasserted his previous statements that Simon was alive on Saturday.

¶ 17. During this interview, Manthey raised emotional topics such as the death of Hoppe's parents, Hoppe's military service, and the death he saw in Vietnam. He also discussed how Simon's family was feeling and their need for an answer as to what had happened to Simon. He told Hoppe that, although he

302

could not make any promises, he would tell the district attorney if Hoppe cooperated.

¶ 18. By the close of the interview, Hoppe admitted that he and Simon had argued on Friday. He said that she hit him and called him a "drunken old bum," and that he had hit her several times. After she fell to the floor, he kicked her a number of times with at least one kick to the head. Hoppe also briefly stated that during the fight Simon had driven away, but agreed that this was not true after Captain Manthey told him the neighbors said the cars had not been moved.

¶ 19. Hoppe's former wife visited him again on March 9 between 5:30 and 6:30 p.m. During this visit, Hoppe insisted that there was a woman lying in his bed snoring. After Hoppe's former wife repeated a number times there was no woman in his bed, Hoppe indicated he realized no one was there. She described two other instances during that visit when Hoppe stated that he saw something that was not there. Hoppe told her that he had informed the police that Simon was killed when they were driving to buy some alcohol. He told them that she was killed when he went through a red light and a car struck their car. When Hoppe's former wife reminded him that he did not drive, Hoppe said a taxi cab had driven them to get alcohol and the driver helped him walk back into his apartment and that is when he found Simon dead.

¶ 20. Captain Manthey testified at the suppression hearing that during the three interviews Hoppe seemed confused about some things but not others. Manthey believed that Hoppe's condition was the worst during the second interview. Captain Manthey testified that he talked to Dr. Hayes after the second interview to determine .whether Hoppe's grogginess would wear off in time for the third interview. Dr. Hayes told Captain

Manthey that if the grogginess did not alleviate by the next day, they would administer a CAT scan. On March 9, however, Captain Manthey did not consult with any medical personnel to determine whether Hoppe's mental status had improved or whether a CAT scan had been ordered.

¶ 21. Captain Manthey agreed that during the interviews he suggested scenarios to Hoppe and asked him leading questions. For example, he repeatedly told Hoppe that he was with Simon when she died. He also repeatedly told Hoppe that he was not being truthful and that he believed there was deception in his answer when he denied harming Simon.

¶ 22. Dr. Hayes testified that he visited Hoppe on March 8 and March 10. As previously noted, during the March 8 visit, he found Hoppe to be either hallucinating or delusional. However, when he returned to see Hoppe on March 10, he noted that Hoppe was no longer delirious but remained confused. Dr. Hayes opined that Hoppe had a condition called "confabulation" which meant that the person hides the things he or she cannot remember by adding details that sound logical but which are not necessarily true.

¶ 23. He also testified that he had reviewed the transcripts of the three interviews and in his opinion, Hoppe did not understand everything that was going on during those interviews or what was in his best interest. Dr. Hayes said that Hoppe was not competent to consent to being questioned and did not have the reasoning or understanding to withdraw his consent to questioning. He explained that because of confabulation, Hoppe was susceptible to suggestions and would answer things in a certain way to please the questioner. Though Dr. Hayes had not evaluated Hoppe's mental condition for purposes of legal competence as he would

304

have for a competency hearing, he diagnosed Hoppe's condition on March 8 and again on March 10 as "dementia and alcohol delirium, the latter caused by alcohol withdrawal."

¶ 24. At the suppression hearing, Dr. James Whitman, a psychiatrist who had listened to the tapes, reviewed Hoppe's medical records, and interviewed Hoppe several months after the police interviews, testified that Hoppe's condition on March 6 through March 9 was severe, chronic, end-stage alcohol dependence; alcohol induced amnesiac disorder; alcohol induced psychotic disorder with delusions and hallucinations; alcohol withdrawal delirium; and alcohol related dementia (long-term decrease in cognitive functioning and memory which is present even after a person has recovered from alcohol withdrawal). Dr. Whitman also pointed to several physical factors that influenced Hoppe's ability to track information, including his dehydration, decrease in blood sugar, and decrease in potassium.

¶ 25. He noted that several of Hoppe's responses in the tapes indicated confabulation. Further, he testified that a person who is confabulating is trying to tell the truth and is trying to be cooperative. The likely result of being told he or she is lying is that the person would come up with a different answer, and that is what appeared to happen in the interviews. In Dr. Whitman's opinion, Hoppe's competency to consent to questioning was impaired from March 6 to March 9 and his ability to comprehend the circumstances was substantially impaired during that time.

¶ 26. After reviewing the case law, including *State v. Clappes,* 136 Wis. 2d 222, 401 N.W.2d 759 (1985), and *Colorado v. Connelly,* 479 U.S. 157 (1986), the circuit court concluded that Hoppe's statements in the three

305

interviews were involuntary. The circuit court based its decision on Hoppe's personal characteristics, the conduct of the law enforcement officers, and the totality of the circumstances in which the questioning occurred.

¶ 27. The court found that Hoppe was "very vulnerable and very susceptible" and that his significant impairments were open and obvious to the officers. The court explained that "one only needs to listen to the audiotapes to note the impairment referred to by the doctors . . . ." It described Hoppe's mental and physical condition as follows: "He had been dehydrated; he had been vomiting; he was suffering tremors; he was lethargic; he had slurred speech and difficulty tracking questions; his blood sugar had been low and he needed oxygen; he suffered some hallucinations . . . ."

¶ 28. The circuit court acknowledged that the conduct of the officers did not include "egregious actions" like those that had led to suppression in other cases. There were no threats, no force used, no explicit intimidation, no withholding of food or water, and no promises made except for noting cooperation with the district attorney. It stated that Captain Manthey appeared to be uncommonly helpful to Hoppe during the course of the interviews. The tone and manner of the questioning was not harsh.

¶ 29. However, in light of Hoppe's condition, the court found that, under the totality of the circumstances, certain behaviors of the police constituted coercive pressures brought to bear on Hoppe. Specifically, the court noted that the aggregate length of the interviews, five hours, and the absence of a *Miranda*[2] warning should be considered. It noted that over the course of the three interviews, the questioning of

---

[2] *Miranda v. Arizona,* 384 U.S. 436 (1966).

Hoppe became more accusative in presenting fact scenarios and more coercive. The circuit court pointed to the last interview and found that there was an increase in the use of psychological pressure by raising emotional topics such as the death of Hoppe's parents, the concerns of Simon's family, and Hoppe's experiences in Vietnam. It found that the police exhibited no concern regarding Hoppe's mental capacities and seemed to be "insensitive to the very obvious impairments being demonstrated by Mr. Hoppe during the course of questioning."

¶ 30. While the court acknowledged that under different circumstances the police behavior may not be oppressive, under the circumstances of this case, they were. The court noted that "[w]hile these techniques, under different circumstances, might not be considered oppressive, they reach a different level because of the circumstances under which the questioning occurred and because of the characteristics being demonstrated by Mr. Hoppe." Under the totality of the circumstances, the circuit court concluded that the State had not met its burden to show that the statements given by Hoppe were voluntary, and Hoppe's motion to suppress was granted.

¶ 31. The court of appeals affirmed. It cited *Clappes* and *State v. Xiong,* 178 Wis. 2d 525, 504 N.W.2d 428 (Ct. App. 1993), in support of its decision. The court of appeals noted that the State was challenging the circuit court's findings. It advanced that the proper question was whether, in view of the findings of the circuit court concerning Hoppe's condition, the police pressure on him was such as to exceed his ability to resist.

¶ 32. The court of appeals rejected the State's suggestion that in the absence of explicitly egregious or

coercive tactics of the police, Hoppe's statement must be found to be voluntary. Citing *Xiong,* the court of appeals stated that ". . . overt acts are not the sole criterion for coerciveness. If there is evidence that police are taking subtle advantage of a person's personal characteristics, that may be a form of coercion." *Xiong,* 178 Wis. 2d at 534.

## II

¶ 33. This case presents us with an opportunity to review whether statements made by a criminal defendant are inadmissible against the defendant when, under the totality of the circumstances, the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist. In determining whether the statements at issue in this case are inadmissible, we must consider whether the court of appeals and the circuit court placed undue weight on Hoppe's condition and, as a result, erroneously concluded that Hoppe's statements were involuntary.

¶ 34. The question of voluntariness involves the application of constitutional principles to historical facts. We give deference to the circuit court's findings regarding the factual circumstances that surrounded the making of the statements. *Arizona v. Fulminante,* 499 U.S. 279, 287 (1991); *State v. Clappes,* 136 Wis. 2d 222, 235, 401 N.W.2d 759 (1987). However, the application of the constitutional principles to those facts is subject to independent appellate review. *Fulminante,* 499 U.S. at 287; *Clappes,* 136 Wis. 2d at 235.

¶ 35. We first describe the standards for assessing whether Hoppe's statements were voluntary. We then consider the State's arguments regarding whether the

court of appeals and the circuit court placed undue weight on Hoppe's condition in concluding that Hoppe's statements were involuntary. Finally, we apply the legal standards to the facts of this case and conclude that the State failed to satisfy its burden in proving that Hoppe's statements were voluntary.

## III

¶ 36. If Hoppe's statements were involuntary, the admission of the statements would violate his due process rights under the Fourteenth Amendment of the U.S. Constitution and Article I, Section 8 of the Wisconsin Constitution. *Rogers v. Richmond,* 365 U.S. 534, 540 (1961); *see State v. McManus,* 152 Wis. 2d 113, 130, 447 N.W.2d 654 (1989). A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist. *Clappes,* 136 Wis. 2d at 236; *Norwood v. State,* 74 Wis. 2d 343, 364, 246 N.W.2d 801 (1976); *State v. Hoyt,* 21 Wis. 2d 284, 308, 128 N.W.2d 645 (1964).

¶ 37. The pertinent inquiry is whether the statements were coerced or the product of improper pressures exercised by the person or persons conducting the interrogation. *Barrera v. State,* 99 Wis. 2d 269, 291, 298 N.W.2d 820 (1980). Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness. *Connelly,* 479 U.S. at 167; *Clappes,* 136 Wis. 2d at 239.

¶ 38. We apply a totality of the circumstances standard to determine whether a defendant's statements are voluntary. *Clappes,* 136 Wis. 2d at 236. The totality of the circumstances analysis involves a balancing of the personal characteristics of the defendant against the pressures imposed upon the defendant by law enforcement officers. *Id.*

¶ 39. The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. *Id.* The personal characteristics are balanced against the police pressures and tactics which were used to induce the statements, such as: the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination. *Id.* at 236–237.

¶ 40. The balancing of the personal characteristics against the police pressures reflects a recognition that the amount of police pressure that is constitutional is not the same for each defendant. When the allegedly coercive police conduct includes subtle forms of psychological persuasion, the mental condition of the defendant becomes a more significant factor in the "voluntariness" calculus. *Connelly,* 479 U.S. at 164; *Xiong,* 178 Wis. 2d at 534. It is the State's burden to prove by a preponderance of the evidence that the statements were voluntary. *United States v. Haddon,* 927 F.2d 942,

945 (7th Cir. 1991); *State v. Agnello,* 226 Wis. 2d 164, 182, 593 N.W.2d 427 (1999).

## IV

¶ 41. The State contends that the court of appeals and the circuit court overemphasized Hoppe's mental status while minimizing the importance of what both courts acknowledge was not extreme misconduct. It asserts that none of the faults found by the courts, when considered alone or as a whole, amounts to improper pressure on Hoppe. In making these arguments, the State relies on *Connelly* and *Clappes,* in which statements were found to be voluntary because of the absence of coercive police conduct.

¶ 42. In *Connelly,* the defendant approached a police officer and stated that he murdered someone and wanted to talk about it. After being repeatedly advised of his *Miranda* rights, the defendant detailed the story of a murder he committed and revealed the exact location of the murder. The defendant was held overnight. The next day he became visibly disoriented and was sent to a state hospital for evaluation. A psychiatrist indicated that the defendant was following the "voice of God" in confessing to the murder. He testified that the defendant suffered from a psychosis that interfered with his ability to make free and rational choices.

¶ 43. The United States Supreme Court recognized that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant to be a more significant factor in the balancing test. *Connelly,* 479 U.S. at 164. Essentially, the Court recognized that egregious police conduct is not necessary for a finding of

involuntariness and that certain subtle pressures that are not coercive for an ordinary person could be considered coercive for a person who is suffering from mental difficulties. The Court however qualified this with its conclusion that there must be police conduct causally related to the confession for the confession to be considered involuntary. *Id.* at 167.

¶ 44. *Clappes* involved a consolidated appeal that addressed two separate cases in which pretrial suppression orders were granted. The defendant in each case was suffering from severe pain from injuries incurred in a car accident. Each defendant was also intoxicated. The police questioned each defendant for a short period of time not lasting more than three minutes. The questioning focused on the identity of the persons in the car and the identity of the drivers.

¶ 45. The *Clappes* court acknowledged that coercive police activity may arguably take subtle forms. *Clappes,* 136 Wis. 2d at 238. However, in examining the police conduct in the cases before it, the court concluded that the conduct did not violate the due process clause. *Id.* at 225. It noted that merely asking an injured and intoxicated defendant questions for a brief period of time is generally not an impermissible, coercive police tactic.

¶ 46. Both *Connelly* and *Clappes* support the proposition that some coercive or improper police conduct must exist in order to sustain a finding of involuntariness. However, both of these cases also recognize that police conduct does not need to be egregious or outrageous in order to be coercive. Rather, subtle pressures are considered to be coercive if they exceed the defendant's ability to resist. Accordingly, pressures that are not coercive in one set of circumstances may be

coercive in another set of circumstances if the defendant's condition renders him or her uncommonly susceptible to police pressures.

V

¶ 47. We turn next to apply the law to the findings of fact that the circuit court made in this case. We first examine Hoppe's personal characteristics. Hoppe was having significant mental and physical difficulties at the time of the interviews. The testimony before the circuit court described his condition.

¶ 48. Hoppe was suffering from cognitive impairment associated with his chronic alcoholism. He had deficits in his short-term memory and impairment of his reasoning and problem-solving abilities. He was hallucinating. He was confabulating, meaning that he was making up for his deficits by answering questions by stating what he thought sounded correct or reasonable. Hoppe had a tendency during the questioning to adopt, over time, the scenarios suggested by Captain Manthey during the course of the interviews. He had difficulty understanding the questions as evidenced by a need for repetition and long pauses between questions and answers. He demonstrated difficulty following simple directions. Hoppe had slurred speech and drifted off. During the second and third interviews, he was on a Librium protocol, which reportedly can cause confusion.

¶ 49. Hoppe's physical state was affected by his alcoholism and his state of alcohol withdrawal. He was lethargic, dehydrated, had been vomiting, and suffered tremors. Upon admission to the hospital, his blood sugar was low and he needed oxygen.

313

¶ 50. Dr. Hayes believed that Hoppe was not competent to consent to questioning and not competent to withdraw his consent. While Dr. Hayes' opinion in this regard is not a legal conclusion, it is a professional opinion that is relevant to the analysis of whether Hoppe's statements were the product of a free and unconstrained will, reflecting deliberateness of choice.

¶ 51. The circuit court listened to the audiotape recordings of the interviews which supported the medical testimony regarding Hoppe's difficulties. It noted that the State did not call any additional medical or psychological experts to testify regarding Hoppe's mental or physical condition. The court concluded that Hoppe's mental and physical conditions made him "a very vulnerable and very susceptible subject" and that many of his impairments were open and obvious to the police officers. Finally, the court noted that Hoppe had little prior experience with the criminal justice system.

¶ 52. The State quarrels with the factual findings of the circuit court and argues that Hoppe was not as mentally frail as the circuit court suggests. However, there is support in the record for the circuit court's findings. They are supported by the testimony of the various individuals that treated Hoppe, Hoppe's former wife, and the police officers. The court's findings are further supported by the tape recordings and the transcripts of the interviews. We do not find any of the court's findings of fact regarding Hoppe's mental and physical condition to be clearly erroneous.

¶ 53. Admittedly, the facts in this case are somewhat unique. The circuit court was able to consider expert testimony based in part on evaluations that occurred in the hospital between the interviews, rather than expert testimony based on evaluations that occurred weeks or months after the interviews took place.

In addition, the circuit court was able to listen to and evaluate the recordings of the interviews.

¶ 54. Given Hoppe's personal characteristics, we now turn to the pressures and tactics used by the police officers during the interviews. The questioning was for an aggregate period of approximately five hours over a three-day period. The longest of the three interviews was the third interview on March 9, lasting approximately two hours and during which the most significant incriminating statements were made.

¶ 55. The questioning during the third interview was much more direct and accusatory than the prior questioning. The circuit court found that there was increased use of psychological pressure by using emotional topics such as the death of Hoppe's parents, the concerns of the family of the deceased, and Hoppe's prior military service in Vietnam. The police asked leading questions and suggested scenarios of arguments and events. The officers made little effort to consult with medical personnel to determine Hoppe's medical condition and capacity to be interviewed.

¶ 56. Finally, no *Miranda* warnings were given to Hoppe. Although the circuit court ruled that the *Miranda* warnings were not required, the circuit court was correct to consider the absence of the warnings in its voluntariness analysis. *See Clappes,* 136 Wis. 2d at 237.

¶ 57. We agree with the circuit court that the question of voluntariness in this case is a very difficult one. We are not dealing here with egregious or outrageous police conduct. There were no threats or promises. A relatively friendly tone was used in portions of the interviews.

¶ 58. However, the totality of the circumstances standard does not require that egregious or outrageous

police conduct be present. As noted above, evaluating whether police conduct is coercive is dependent on the personal characteristics of the defendant. The purpose of the balancing test is to determine whether the pressures created by the police conduct exceeded the defendant's ability to resist. The court of appeals correctly explained that police coercion and a defendant's personal characteristics are interdependent concepts. The greater the vulnerability of the defendant, the more easily the defendant may be coerced by subtle means.

¶ 59. Though the court of appeals and the circuit court did not identify a single act by the police that was egregious, put together, the actions of the police and the personal characteristics of Hoppe indicate that Hoppe's statements were involuntary. The tactics used and the pressures exerted by the police were subtle and certainly not improper if used in the questioning of a person whose personal characteristics did not make him or her uncommonly susceptible to police pressures.

¶ 60. In sum, we conclude that the circuit court's findings of fact regarding Hoppe's mental condition were not clearly erroneous. The State did not satisfy its burden in proving that Hoppe's statements were voluntary. Rather, we determine that, under the totality of the circumstances, given Hoppe's severely debilitated mental and physical condition, the coercive pressures exerted by police during these interviews exceeded Hoppe's ability to resist. Accordingly, we determine that the statements were involuntary and we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 61. DIANE S. SYKES, J. *(dissenting).* It is well-

established that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* 479 U.S. 157, 167 (1986). A confession will not be suppressed as involuntary unless there is an "essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other." *Id.,* 497 U.S. at 165.

¶ 62. To determine whether a confession is voluntary within the meaning of the due process clause, the "essential inquiry is whether the confession was procured via coercive means or whether it was the product of improper pressures exercised by the police." *State v. Clappes,* 136 Wis. 2d 222, 235–36, 401 N.W.2d 759 (1987). "The presence or absence of actual coercion or improper police practices is the focus of the inquiry because it is determinative on the issue of whether the inculpatory statement was the product of a 'free and unconstrained will, reflecting deliberateness of choice.' " *Id.* (quoting *Norwood v. State,* 74 Wis. 2d 343, 364, 246 N.W.2d 801 (1976)).

¶ 63. Voluntariness is determined by an examination of the "totality of the circumstances," which in turn "requires the court to balance the personal characteristics of the defendant against the pressures imposed upon him by police in order to induce him to respond to the questioning." *Clappes,* 136 Wis. 2d at 236. Nevertheless, in the absence of coercive or otherwise improper police conduct, and a link between that conduct and the confession, a court cannot conclude that a confession is involuntary within the meaning of the due process clause. *Connelly,* 479 U.S. at 165; *Clappes,* 136 Wis. 2d at 240. "Therefore, because there is no support for the proposition in Wisconsin that the amount of

317

pressure or coerciveness required can decrease to none, a defendant's personal characteristics, while certainly relevant to our analysis, are simply not dispositive of the issue of voluntariness." *Clappes,* 136 Wis. 2d at 240.

¶ 64. There is no evidence of coercion or improper police conduct in this case. The majority's conclusion that Hoppe's statements were involuntary turns entirely on the evidence regarding Hoppe's personal characteristics, in particular, his impaired mental and physical condition brought on by alcohol withdrawal. The majority concludes that Hoppe's compromised mental and physical condition renders the otherwise non-coercive and completely proper police conduct in this case coercive and improper, making Hoppe's statements unconstitutionally involuntary. Majority op., ¶¶ 59–60. I cannot agree.

¶ 65. The majority states that "[w]hen the allegedly coercive police conduct includes subtle forms of psychological persuasion, the mental condition of the defendant becomes a more significant factor in the 'voluntariness' calculus," Majority op., ¶ 40 (citing *Connelly,* 479 U.S. at 164). The majority has taken this statement from *Connelly* out of context, as the sentences on either side of the cited statement make clear. The entire passage from *Connelly* is as follows:

> Thus, the cases considered by this Court over the 50 years since *Brown v. Mississippi* [the Supreme Court's seminal confession case] have focused upon the crucial element of police overreaching. While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal

318

defendant of due process of law. Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."

*Connelly,* 479 U.S. at 163–64 (internal citations omitted).

¶ 66. The majority overstates *Connelly's* holding so as to support the conclusion that Hoppe's statements were constitutionally involuntary. In so doing, the majority has allowed the personal characteristics of the defendant—here, mental and physical vulnerability associated with alcohol withdrawal—to overcome the absence of any police coercion or improper conduct for purposes of determining voluntariness.

¶ 67. *Connelly* did *not* hold that a defendant's compromised or vulnerable mental condition can render non-coercive and proper police conduct coercive and improper, as the majority asserts. Majority op., ¶ 43. At best, *Connelly* suggests that a defendant's mental condition may become "a more significant factor" depending upon the presence of "more subtle forms of psychological persuasion." *Connelly,* 479 U.S. at 164. The Supreme Court in *Connelly* reiterated unequivocally that constitutional involuntariness requires "a substantial element of coercive police conduct." *Id.*

¶ 68. Our own confession case, *Clappes* (which cited and discussed *Connelly*), reinforces this requirement: "in order to justify a finding of involuntariness, there must be some affirmative evidence of improper

319

police practices deliberately used to procure a confession." *Clappes,* 136 Wis. 2d at 239.

¶ 69. There is no evidence of coercive or improper police conduct here. The three police interviews with the defendant were spread out over three days, and none was inordinately long. There were no threats or promises, no force was used, no intimidation of any kind was applied, there were no harsh words or tone of voice, no withholding of food or water, and the circuit court found that the officer was "uncommonly helpful" to Hoppe during the interviews. The circuit court found that the officer's questioning in the third interview did become more accusatory in nature, and it involved an increase in "psychological pressure" in that the officer referred to emotional topics such as the death of Hoppe's parents, concern about the victim's family, and Hoppe's service in Vietnam. The circuit court also noted that there were no *Miranda* warnings given, which, although not required, is relevant to the issue of voluntariness. The evidence also clearly establishes that Hoppe's physical and mental condition was compromised by severe alcohol withdrawal.

¶ 70. Considered in its totality, and applying a de novo standard of review to the constitutional voluntariness issue, *see Clappes,* 136 Wis. 2d at 235, I conclude that the police conduct in this case was not coercive or improper so as to render Hoppe's statements constitutionally involuntary. The evidence that the officer's questions in the third interview were more accusatory than inquisitive, and the evidence that the officer referred to the death of Hoppe's parents, the concerns of the victim's family, and Hoppe's service in Vietnam, simply does not support a conclusion that the police coerced or improperly induced Hoppe's statements, even when considered in the context of Hoppe's com-

320

promised physical and mental condition and the absence of *Miranda* warnings.

¶ 71. Given this absence of any evidence of police coercion or improper conduct, the State met its burden of proving, by a preponderance of the evidence, *see State v. Agnello,* 226 Wis. 2d 164, 182, 593 N.W.2d 427 (1999), that the statements were voluntary and therefore admissible. I would reverse the court of appeals and the circuit court.

¶ 72. I am authorized to state that Justice DAVID T. PROSSER, JR. joins this dissent.