In the INTEREST OF JOEL I.-N.,
a person under the age of 17:
STATE of Wisconsin, Petitioner-Respondent,

v.

JOEL I.-N., Respondent-Appellant.†

Court of Appeals

*No. 2014AP610. Submitted on briefs September 2, 2014.*
*—Decided October 7, 2014.*

2014 WI App 119

(Also reported in 856 N.W.2d 654.)

† Petition for Review filed.

404

405

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Eileen A. Hirsch*, assistant state public defender, Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *John M. Stoiber*, assistant district attorney and *John T. Chisholm*, district attorney Wauwatosa.

Before Fine, Kessler and Brennan, JJ.

¶ 1. BRENNAN, J. Joel I.-N. appeals from a dispositional order finding him delinquent, entered after Joel admitted to the charge of armed robbery with threat of force, as party to a crime. *See* WIS. STAT. §§ 943.32 & 939.05 (2011–12).[1] Joel argues that the circuit court erred when it denied his motion to suppress the statement he made to police while riding in an ambulance because: (1) the police failed to record the statement, *see* WIS. STAT. §§ 938.31(3)(b) & 938.195(2)(b); and (2) he did not knowingly, intelligently, and voluntarily waive his right to remain silent. Because we conclude that exigent-public-safety circumstances existed that rendered recording Joel's statement infeasible and that his statement was knowingly, intelligently, and voluntarily given, we affirm.

## BACKGROUND[2]

¶ 2. On August 11, 2013, at about 2:25 a.m., Megan D. was outside with her dog in the Village of West Milwaukee, when she was approached by two

---

[1] All references to the Wisconsin Statutes are to the 2011–12 version.

[2] The facts are those set forth by the witnesses at the hearing on Joel's motion to suppress. They are undisputed for purposes of this appeal.

Hispanic teenage males. One of these teenagers was armed with a knife that was five to six inches in length, which he placed to Megan's throat while demanding her purse. She surrendered her purse to the robbers, and the teenagers fled westbound on foot through an alley.

¶ 3. The search for the suspects was conducted by West Milwaukee Police with the assistance of the West Allis Police Department. West Milwaukee Police contacted the West Allis Police Department seeking "mutual aid" in the form of a K-9 unit to assist in searching for multiple suspects in the armed robbery. At about 2:30 a.m., West Allis Police Officer Ryan McNally and his police-trained dog, Diesel, became involved.

¶ 4. Officer McNally was there to set up a perimeter because the suspects had been seen running into West Allis. He met up with, and then worked with, Officer Eric French of the West Milwaukee Police Department. Officer French had advised him that they were looking for three to four robbers, who had fled northwest on foot. The officers (and the police dog, Diesel) went to the location Officer French had designated. A person nearby advised Officer French that someone had been running through yards just to the north of a residence, so this became the immediate area of their search.

¶ 5. Diesel alerted Officer McNally that a suspect may be in a particular backyard area. Inside this residential yard was a structure that had a large tarp around it: Officer McNally referred to the structure as a carport and Officer French referred to it as a tent. Officer McNally announced that he was a police officer and commanded anyone there to identify themselves or he would send his dog to find them. No one revealed themselves or responded. Diesel went underneath the tarp, bit Joel on his left knee, and dragged Joel from his

hiding spot. The bite lasted approximately twenty seconds and ended upon Officer McNally's command. Joel was immediately arrested and handcuffed at around 3:30 a.m., about one hour after the robbery occurred.

¶ 6. Because of the dog bite, police protocol required the officers to have Joel transported to the hospital. Joel was walked to the curb and "very short[ly]," within a "[c]ouple [of] minutes," was taken by ambulance to West Allis Memorial Hospital. As required by police procedure, Officer French rode in the ambulance with Joel.

¶ 7. On the way to the hospital, Joel, who was bleeding and likely in some pain, was handcuffed to the cot he was lying on. Officer French made the decision to interview Joel at that time. Officer French testified that he did so because he believed there were other armed robbers still at large and he feared for the public's safety.

¶ 8. Officer French read Joel his *Miranda* warnings[3] as they appeared on the Wisconsin Department of Justice card. When asked whether he would be willing to make a statement, Joel said that he wanted to "cooperate." Joel then admitted to Officer French that he had been involved in the robbery, described the others who were involved in the robbery, described a specific spot they all ran to, and told Officer French that the other robbers ran westbound.

¶ 9. Joel was treated at the hospital, receiving two stitches for his dog bite wound. Officer French estimated that the hospital stay was over an hour long. While en route from the hospital to the police station, Joel continued to cooperate, showing the police where some of the property taken from the victim was located. Later, at the West Milwaukee Police Department, Detec-

---

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

tive Sergeant Shaundra Randolph read Joel his *Miranda* warnings again, after which Joel chose to remain silent.

¶ 10. The State filed a delinquency petition, charging Joel with armed robbery with threat of force, as party to a crime. Joel filed a motion to suppress the statement he made in the ambulance on the grounds that it was not audio recorded as required by law, and on the grounds that his statement was not knowing, intelligent, and voluntary. The juvenile court denied his motion, finding that the exigent-public-safety exception, set forth in Wis. Stat. § 938.31(3)(c)5., excused audio recording Joel's statement, and further finding his statement was knowingly, intelligently, and voluntarily made. Thereafter, Joel admitted the offense as charged, and was given a juvenile disposition. Joel appeals.

## DISCUSSION

¶ 11. Joel raises two issues on appeal. First, he argues that the circuit court erred when it concluded that the statement he made to Officer French while in the back of the ambulance is admissible because Joel contends that Wis. Stat. §§ 938.31(3)(b) and 938.195(2)(b) required the statement be recorded. Second, Joel contends that even if the juvenile-recording statutes do not apply, the statement was not made knowingly, intelligently, and voluntarily as required by the Fourteenth Amendment. We disagree and affirm.

**I. Joel's unrecorded statement to police, made while handcuffed in the back of the ambulance, is admissible because exigent-public-safety circumstances existed, which rendered recording the statement infeasible.**

¶ 12. Joel argues that the statement he made to Officer French while handcuffed in the back of

412

the ambulance is inadmissible under Wis. Stat. §§ 938.31(3)(b) and 938.195(2)(b) because it was not recorded. Because we conclude that exigent-public-safety circumstances existed, rendering recording infeasible pursuant to Wis. Stat. § 938.31(3)(c)5., we affirm.

¶ 13. Joel's argument turns on a question of statutory interpretation, an issue we review independently of the circuit court. *See Juneau Cnty. v. Associated Bank, N.A.*, 2013 WI App 29, ¶ 15, 346 Wis. 2d 264, 828 N.W.2d 262. "The purpose of statutory interpretation is to discern the intent of the legislature. When we interpret a statute, we begin with the statute's plain language, as we assume the legislature's intent is expressed in the words it used." *Id.*, ¶ 16 (internal citation omitted). In addition, "[w]e interpret statutory language in the context in which it is used, [and] in relation to the language of surrounding or closely-related statutes." *Id.* If this process of interpretation yields a plain meaning, the statute is unambiguous, and we apply its plain meaning. *State v. Harmon*, 2006 WI App 214, ¶ 10, 296 Wis. 2d 861, 723 N.W.2d 732.

¶ 14. Wisconsin Stat. § 938.31(3)(b) states that:

> Except as provided under par. (c), a statement made by [a] juvenile during a custodial interrogation is not admissible in evidence against the juvenile in any court proceeding alleging the juvenile to be delinquent unless an audio or audio and visual recording of the interrogation was made as required under [Wis. Stat.] s. 938.195(2) and is available.

The circuit court applied the exigent-public-safety exception, set forth in § 938.31(3)(c)5., which states: "A

juvenile's statement is not inadmissible in evidence under par. (b) if . . . [e]xigent public safety circumstances existed that prevented the making of an audio or audio and visual recording or rendered the making of such a recording infeasible." *Id.* We agree with the circuit court that exigent-public-safety circumstances exist in this case.

¶ 15. Neither Wɪꜱ. Sᴛᴀᴛ. § 938.31(3)(c)5. nor our case law has defined the contours of what exigent-public-safety circumstances are within the meaning of the juvenile-recording statute. Therefore, we seek guidance from *New York v. Quarles*, 467 U.S. 649 (1984), in which the United States Supreme Court set forth a public-safety exception to the requirement that *Miranda* warnings be given before a suspect's statements may be admitted into evidence. *See Quarles*, 467 U.S. at 655–60. Under that exception, the Court held that police are not required to give *Miranda* warnings before asking questions "reasonably prompted by a concern for the public safety." *Id.* at 656.

█

¶ 16. We conclude that Officer French's decision to question Joel in the back of the ambulance was reasonably prompted by a concern for the public safety here. Officer French testified that he decided to question Joel because he believed that there could be other armed robbers still at large. He had been told that there were three to four teenagers involved in the robbery, at least one of whom had a knife and had used it in a dangerous and threatening manner. Only an hour had passed since Joel and his friends had robbed Megan by placing a knife to her neck, and at least one of the robbers—Joel—had recently been found running through backyards in the community. The knife used in the robbery had not been recovered.

¶ 17. Given the exigent-public-safety circumstances that existed, we conclude that recording Joel's statement in the ambulance was not feasible. In the context of recording juvenile statements, we have defined "feasible" as meaning " 'capable of being done or carried out.' " *State v. Dionicia M.*, 2010 WI App 134, ¶ 12, 329 Wis. 2d 524, 791 N.W.2d 236 (citation omitted).[4] It does not, however, mean " 'effortless.' " *Id.*, ¶ 14.

¶ 18. At the time he was questioned by Officer French, Joel was not at the police station where his statement could easily be recorded. Rather, he was in the back of an ambulance on the way to the hospital for treatment. Officer French testified that "[b]ased on [his] previous experience in ambulances," he did not believe they were equipped with recording equipment. And the hospital is not a place that would logically have police recording equipment available. Officer French testified that, at the time he questioned Joel, he believed it would be a "lengthy amount of time" before Joel would be taken to the police station where recording

---

[4] In *State v. Dionicia M.*, 2010 WI App 134, 329 Wis. 2d 524, 791 N.W.2d 236, we did not expressly define "feasible" as used in Wis. Stat. § 938.31(3), but rather defined "feasible" with relationship to the juvenile-recording requirements set forth in *State v. Jerrell C.J.*, 2005 WI 105, 283 Wis. 2d 145, 699 N.W.2d 110. *See Dionicia M.*, 329 Wis. 2d 524, ¶ 12. In *Jerrell C.J.*, as relevant here, the supreme court "exercise[d] [its] supervisory power to require that all custodial interrogations of juveniles . . . be electronically recorded *where feasible.*" *Id.*, 283 Wis. 2d 145, ¶ 3 (emphasis added). A few months after *Jerrell C.J.* was decided, the legislature codified this rule, creating § 938.31. *See* 2005 Wis. Act 60, § 28. Because *Jerrell C.J.* remains good law and is the precursor to § 938.31, it follows that the same definition of "feasible" should be applied to both *Jerrell C.J.* and the statute; therefore, we do so here.

equipment was available. Given the urgency of apprehending the armed robbers potentially still at large in the community, Officer French reasonably concluded that there was no time to wait hours for recording equipment; in other words, the circumstances made recording the statement infeasible.

¶ 19. Joel contends that time was not a factor when Officer French questioned him in the back of the ambulance because multiple other suspects had already been detained. As such, Joel believes that Officer French should have consulted with the other police officers before questioning Joel to determine conclusively whether all of the participants of the robbery had been detained. We disagree.

¶ 20. Officer French testified that at the time he questioned Joel in the back of the ambulance he knew that multiple other suspects had been detained but that he "had very little information about that because I was with Officer McNally and his canine the entire time." He further stated that he did not know if the suspects "truly were involved, or if they just happened to be in the area."[5] In short, even if Officer French had contacted the other police officers before questioning Joel, there is nothing in the record to suggest he would have been able to verify whether the other individuals the police had detained were actually involved in the robbery or whether there were other dangerous suspects still at large. Only upon speaking to Joel and verifying who was involved in the robbery could Officer French know whether all of the robbers had been apprehended.

***

[5] In fact, Officer French testified that at least one of the individuals police detained that evening during the search was released from custody because police determined the individual was not involved in the robbery.

416

¶ 21. In sum, given the urgent need to apprehend armed robbery suspects who were potentially still in the area and the undetermined length of time it would have taken Officer French to obtain recording equipment, we conclude that "[e]xigent public safety circumstances existed" under WIS. STAT. § 938.31(3)(c)5. that "rendered the making of . . . a recording infeasible." *See id.* Consequently, we affirm.

## II. Joel's statement was made knowingly, intelligently, and voluntarily.

¶ 22. Joel also argues that his statement to Officer French in the ambulance did not result from a knowing, intelligent, and voluntary waiver of his right against self-incrimination. "If his confession was involuntary, its admission would violate [Joel's] due process rights under the Fourteenth Amendment of the U.S. Constitution and Article I, Section 8 of the Wisconsin Constitution." *See State v. Jerrell C.J.*, 2005 WI 105, ¶ 17, 283 Wis. 2d 145, 699 N.W.2d 110. Joel cites primarily to the following factors as weighing against the voluntariness of his statement: his age (fourteen); his third-grade reading level; the fact that Officer French spoke to him in English, while Joel's preferred language is Spanish; his physical condition, in that he had recently been bitten by a police dog and was handcuffed; the failure of police to call his parents; and the confined and private setting of the interview. When these factors are placed within the totality of the circumstances at the time Officer French interviewed Joel, it is clear that Joel's statement was made knowingly, intelligently, and voluntarily. As such, we affirm.

¶ 23. Whether Joel's statement was knowing, intelligent, and voluntary presents a mixed question of fact and law. *See id.*, ¶ 16. "We defer to the circuit court's findings regarding the factual circumstances surrounding the statement." *Id.* But we review independently "the application of constitutional principles to those facts." *Id.*

¶ 24. We evaluate the voluntariness of Joel's confession by examining "the totality of the circumstances surrounding [his] confession." *See id.*, ¶ 20. "[A] defendant's statements are voluntary 'if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist.' " *Id.*, ¶ 18 (citation omitted). In contrast, statements may be found involuntary if they are the product of "coercive or improper police conduct." *See id.*, ¶ 19. Thus, we balance "the personal characteristics of the defendant against the pressures and tactics used by law enforcement officers." *See id.*, ¶ 20.

> The relevant personal characteristics of the defendant include the defendant's age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. The personal characteristics are balanced against the police pressures and tactics which were used to induce the statements, such as: the length of the questioning, any delay in arraignment, the general conditions under which the statements took place, any excessive physical or psychological pressure brought to bear on the defendant, any inducements, threats, methods or strategies used by the police

418

to compel a response, and whether the defendant was informed of the right to counsel and right against self-incrimination.

*See id.* (citing *State v. Hoppe*, 2003 WI 43, ¶ 39, 261 Wis. 2d 294, 661 N.W.2d 407).

██ ██

¶ 25. In evaluating the conduct of the police, we must keep in mind that no two situations are alike. " '[P]ressures that are not coercive in one set of circumstances may be coercive in another set of circumstances if the defendant's condition renders him or her uncommonly susceptible to police pressures.' " *See Jerrell C.J.*, 283 Wis. 2d 145, ¶ 19 (citation omitted). Moreover, we must exercise "special caution when assessing the voluntariness of a juvenile confession, particularly when there is prolonged or repeated questioning or when the interrogation occurs in the absence of a parent, lawyer, or other friendly adult." *See id.*, ¶ 21 (citation and quotation marks omitted).

██

¶ 26. With these principles in mind, we turn to Joel's statement to Officer French. We first examine Joel's relevant personal characteristics, including: his age, education and intelligence, physical and emotional condition, and prior experience with law enforcement. *See id.*, ¶ 24. We then consider the pressures and tactics used by the police, including: whether Joel was informed of the right to counsel and the right against self-incrimination, the length of the questioning, the general conditions under which the statements took place, and any excessive physical or psychological pressure, including any inducements, threats, methods or strategies used by the police to compel a response. *See id.*

419

¶ 27. Certainly, Joel has a number of personal characteristics that weigh against concluding that his statement was voluntary. For instance, at the time of his arrest, Joel was only fourteen years old; he was of limited intelligence and "behind in school"; he was handcuffed in the back of an ambulance, presumably in some pain from a dog bite; and Officer French interviewed him in English when Joel's primary language is Spanish. However, the circuit court found that it was "undisputed that all the people who dealt with [Joel], police officers dealt with him in English, didn't notice a problem." The circuit court ultimately concluded that Joel's preference for Spanish was not a "substantial factor in this situation." In fact, the circuit court stated that it had "no doubt that Joel understood what the police officer was telling him." The circuit court's finding is supported by the record.

¶ 28. Furthermore, those personal characteristics must be weighed against the circuit court's finding that Joel was "not inexperienced . . . in the law enforcement world," noting that "Joel has a prior adjudication for a serious offense." In fact, Joel's prior experience with law enforcement was also for an armed robbery offense, which was later amended to theft and for which he was found delinquent. Joel's prior experience with law enforcement for a similar crime weighs heavily against a finding that his statement was not given knowingly, intelligently, and voluntarily, and counterbalances some of those personal characteristics suggesting otherwise. *See id.,* ¶ 28.

¶ 29. The police interrogation tactics strongly support a conclusion that Joel's confession was knowingly, intelligently, and voluntarily given. Officer French read Joel his *Miranda* rights, and Joel indicated that he understood them. Joel had only been in police

420

custody for a matter of minutes before the ambulance arrived and before he gave his statement to Officer French while in the back of the ambulance on the way to the hospital, suggesting that he was not interrogated for a lengthy period of time. *See Jerrell C.J.*, 283 Wis. 2d 145, ¶ 32 (" 'lengthy interrogation or incommunicado incarceration could be strong evidence of coercion' ") (citation omitted). And Joel has not otherwise alleged nor does the record show that Officer French used inappropriate inducements, threats, methods or strategies to compel Joel's statement.

¶ 30. Joel makes much of the fact that the police did not call his parents before questioning him; however, the supreme court has declined to fashion a *per se* rule requiring parental consultation before a juvenile is questioned. *See id.*, ¶¶ 3, 43. Joel has not stated that he asked for his parents nor has he suggested that the police failed to call his parents " 'for the purpose of depriving [him] of the opportunity to receive advice and counsel.' " *See id.*, ¶ 43 (citation omitted). As such, the police failure to contact Joel's parents does not weigh against a finding that his statement was voluntary.

¶ 31. Weighing Joel's personal characteristics against the pressures and tactics used by the police, we determine that the State has met its burden of proving that Joel's confession was " 'the product of a free and unconstrained will, reflecting deliberateness of choice.' " *See id.*, ¶ 36 (citation omitted). While Joel is young and has some intellectual struggles, his prior experience with the police and the juvenile justice system for an identical offense, suggest that he was well-aware of his rights when he agreed to speak with Officer French. His injury was not serious, requiring only two stitches, and Joel has not alleged that police used any coercive tactics or strategies to obtain his

statement. Officer French read Joel the *Miranda* warnings, and Joel said he understood them before he gave a statement to Officer French, and in fact, when back at the police station, refused to give a statement after again being read the warnings again. His later refusal indicates further that he indeed understood his rights in the first instance.

¶ 32. In short, the State has met its burden of showing that Joel's statement was made knowingly, intelligently, and voluntarily, and we affirm the circuit court.

*By the Court.*—Order affirmed.