COURT OF APPEALS
DECISION
DATED AND FILED

February 22, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* **WIS. STAT. § 808.10 and RULE 809.62.**

**Appeal No. 2021AP193-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2018CF829

**IN COURT OF APPEALS
DISTRICT I**

---

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

CHRISTOPHER R. WARD,

  DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Milwaukee County: MARK A. SANDERS, Judge. *Affirmed*.

Before Brash, C.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Christopher R. Ward appeals his judgment of conviction entered after he pled guilty to child neglect resulting in death. Ward

argues that his confession to police was coerced and therefore not voluntary, and asserts that the trial court should have granted his motion to suppress. Upon review, we affirm.

**BACKGROUND**

¶2 The charge against Ward stems from the death of fourteen-year-old Jada Wright in February 2018. Jada had cerebral palsy and multiple other health issues, was non-verbal, wheelchair bound, and required round-the-clock care. Ward's mother had become Jada's guardian after her parents died, and Ward—who was eighteen years old at the time of Jada's death—was hired as one of Jada's personal care workers.

¶3 According to the complaint, on the day of Jada's death, Ward told police that he had fed Jada through her feeding tube in the afternoon. When Ward checked on Jada about an hour after her feeding, he saw that she had vomited on herself, which was highly unusual. Ward stated that he continued to check on Jada regularly, and at midnight noticed that she was unresponsive and not breathing. Ward called 911 and the paramedics attempted life-saving measures on Jada, but she was pronounced dead at the scene.

¶4 An autopsy performed on Jada revealed blunt force trauma to her abdominal area, which had caused severe damage to her internal organs. The medical examiner determined that this injury had occurred within twelve hours of Jada's death, and ruled her death a homicide.

¶5 Based on these findings and Ward's previous statements to police, Ward was arrested. During his first custodial interview, he claimed that his father, Christopher Frazier, had been taking care of Jada during the afternoon prior to her

death. Ward said that he and his mother had left their residence to run errands that afternoon, leaving Jada in Frazier's care. Ward asserted that it was Frazier who had fed Jada prior to her vomiting.

¶6 Frazier was arrested and interviewed. However, his statement, along with a statement obtained from Ward's mother, was inconsistent with Ward's new version of events: Frazier denied feeding Jada, and Ward's mother denied leaving the residence after 11:00 a.m. that day. Ward's younger brother also provided a statement that it was Ward who fed Jada prior to her vomiting.

¶7 In a subsequent custodial interview, Ward claimed that he had tripped and accidently fallen on Jada, striking her with his elbow in the abdomen; however, that version of events did not comport with the severity of Jada's injuries. Eventually, Ward confessed to striking Jada with his fist in the abdomen in frustration after she had dislodged her feeding tube from its connection to her stomach.

¶8 In total, Ward was interviewed multiple times by police over the course of four days, in sessions that varied in length from just over an hour to five hours, for a total of sixteen hours of interrogation.

¶9 Ward filed a motion to suppress his statement, claiming that it was involuntary. Ward noted his young age, the fact that he had no previous arrest record and thus no experience in "dealing with" the police, and that he had limited education due to dropping out of high school. He argued that those factors combined with the "coercive tactics" used by the detectives "over a very extensive period of high-pressure interrogation" rendered his statement involuntary.

¶10    The trial court denied Ward's motion. It stated that it reviewed the video from the interviews and took those personal characteristics of Ward into consideration, but nevertheless found that the tactics utilized by the police in obtaining his statement did not rise to the level of being coercive. Thus, the court determined that Ward's statement to the police was "the product of free will."

¶11    Ward subsequently entered into a plea agreement with the State in which the charge against him was amended from second-degree reckless homicide to child neglect resulting in death. The trial court accepted Ward's plea in January 2019. Ward was sentenced to nine years of initial confinement to be followed by six years of extended supervision. This appeal follows.

## DISCUSSION

¶12    On appeal, Ward asserts that his statement to police in which he confessed to striking Jada should have been suppressed. The review of a trial court's decision on a motion to suppress presents a mixed question of fact and law. *State v. Eason*, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. We will not reverse the trial court's findings of fact unless they are clearly erroneous; however, we review *de novo* the application of constitutional principles to those facts. *Id.*

¶13    The basis for Ward's argument is that his confession was not voluntary. A defendant's statement is voluntary if it is "the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *State v. Hoppe*, 2003 WI 43, ¶36, 261 Wis. 2d 294, 661 N.W.2d 407. If a statement made by a defendant to police was not voluntary, it is inadmissible to prove his or

her guilt, pursuant to the Due Process Clause. *State v. Deets*, 187 Wis. 2d 630, 635, 523 N.W.2d 180 (Ct. App. 1994).

¶14  "Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness." *Hoppe*, 261 Wis. 2d 294, ¶37. In evaluating police conduct, we review "the length of questioning, general conditions or circumstances in which the statement was taken, whether any excessive physical or psychological pressure was used, and whether any inducements, threats, methods, or strategies were utilized in order to elicit a statement from the defendant." *State v. Ward*, 2009 WI 60, ¶20, 318 Wis. 2d 301, 767 N.W.2d 236 (citation omitted). The State has the burden to prove, by a preponderance of the evidence, that a defendant's statement was voluntary. *Hoppe*, 261 Wis. 2d 294, ¶40.

¶15  Ward asserts that the detectives interviewing him used a variety of tactics to coerce his confession, such as "persistence, repetition, confrontational questioning, kindness, minimization, anger, and implicit threats to [Ward]'s family." However, in rejecting Ward's argument at the suppression motion hearing, the trial court explained it had watched—and rewatched—the videos of the interviews, and it then made extensive, thorough factual findings relating to those videos. It first noted that the total length of the interviews was "somewhat misleading" because they occurred over several days, with breaks in between sufficient for Ward to sleep. The court also observed that Ward's other physical needs—food, water, even cigarettes—were met, and that Ward never appeared to be "in any level of discomfort[.]" Additionally, the State pointed out that the length and number of interviews was directly related to Ward providing a version of the events during his first custodial interview that was different from his initial statement to police on the day that Jada died. This resulted in the police taking time

to investigate, and ultimately discredit, Ward's claim that Frazier was likely responsible for Jada's death.

¶16 Furthermore, the trial court found that while the detectives interviewing Ward used a number of tactics during the various interviews—such as confronting him with the inconsistencies in his second version of events, minimizing his conduct, mentioning the penalties associated with different charging options, and using kindness or anger to play on Ward's emotions—none of those tactics "[rose] to the level of threats or coercive conduct." In fact, the court noted that these types of police tactics have been "typically, commonly accepted" by the courts, even when they were found to have had an influence on the defendant. *See State v. Moore*, 2015 WI 54, ¶64, 363 Wis. 2d 376, 864 N.W.2d 827.

¶17 Additionally, the trial court observed that while the detectives were "very persistent" in their questioning of Ward, persistence itself "is not inherently coercive." In fact, the court pointed out that Ward had the ability to "control" when that persistence would stop by exercising his *Miranda*[1] rights. Furthermore, the court noted that Ward was not arguing that the police failed to advise him of his *Miranda* rights or that he had not knowingly and intelligently waived those rights. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Ward*, 318 Wis. 2d 301, ¶61 (citations omitted).

¶18 Nevertheless, Ward's argument focuses on his personal characteristics, such as his age, lack of experience with police, and limited education

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

6

in support of his argument that his confession was involuntary, and he cites several cases involving the interrogation of juveniles. However, "a suspect's personal characteristics alone cannot form the basis for finding that the suspect's confessions, admissions, or statements are involuntary." *Moore*, 363 Wis. 2d 376, ¶56. Rather, there must be "'some affirmative evidence of improper police practices deliberately used to procure a confession.'" *Id.* (citation omitted). Although the trial court considered Ward's personal characteristics in its analysis at the suppression hearing, a determination that the tactics utilized by the detectives here were not coercive is fatal to Ward's motion. *See id.*

¶19    In our review of the record, the trial court's findings of fact are an accurate reflection of the interviews, and therefore are not clearly erroneous. *See Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530 (an appellate court "defers to the [trial] court's findings of fact unless they are unsupported by the record and are, therefore, clearly erroneous"). Furthermore, we also conclude that the tactics utilized by the detectives during Ward's custodial interviews do not rise to the level of coercion. Thus, the relevant law as applied to the facts here supports the determination that Ward's confession was voluntary. *See Eason*, 245 Wis. 2d 206, ¶9. Therefore, the trial court did not err in denying Ward's suppression motion. *See id.* Accordingly, we affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2019-20).