## PURPURA v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit.   November 13, 1919.)

### No. 1740.

CRIMINAL LAW ⬤⟞519(3)—CONFESSION MADE WHILE UNDER DETENTION INADMISSIBLE.

Where defendant, charged with stealing a package from the post office, where he was employed, was taken in charge by five inspectors and held 24 hours, without being permitted to communicate with friends or procure counsel, being compelled to sleep in the room with one of them, and being told that they believed him guilty and had evidence which made it look bad for him, a confession, written by the inspectors, but signed by him at the end of that time, *held* not voluntary, and not admissible against him.

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Criminal prosecution by the United States against Santo S. Purpura. Judgment of conviction, and defendant brings error. Reversed.

The plaintiff in error, who will be referred to as defendant (such being the position he occupied in the court below), was indicted in the United States District Court for the Eastern District of Virginia upon the charge that, while in the postal service of the United States as a clerk in the Norfolk post office, he did unlawfully and feloniously steal a certain package addressed to Seaboard National Bank, Norfolk, Va., which package had come into his possession by virtue of his employment, said package containing the sum of $3,500. He was placed on trial, and upon his pleading not guilty, after a hearing before a jury, he was found guilty and sentenced to a term of five years in the penitentiary. The case comes here on writ of error for review.

### Statement of Facts.

The facts may be epitomized as follows:

It appears that the defendant entered the Post Office Department as a substitute clerk in the year 1914, and remained so employed at a constantly increasing salary until the year 1918, when he was employed in the registry division of said office, and he so remained with the department until he was dismissed from the service of the government on the 17th day of January, 1919.

The charge against the defendant grows out of the alleged loss of a registered package containing $3,500 in bills, which was sent from the United States post office at Rocky Mount, N. C., addressed to Seaboard National Bank, Norfolk, Va. This package left the Rocky Mount post office on June 19, 1918, and was received at the Norfolk post office on June 20, 1918, about 11:10 a. m. of that day.

Witness R. J. Whitehead testified that he last saw this package in the Norfolk office at 4:15 p. m. on June 20th, and that he then placed a notice of the receipt of the same in the post office lock box of the Seaboard National Bank; that he went off duty and left the post office at 4:15 p. m. of that day, and in his testimony he gives the names of the employés having access to the package, who were on duty at that time, but states that Purpura was not then on duty. This witness is corroborated by C. M. Wolfe. This latter witness was chief clerk in the registry division of the Norfolk office, and states that the package was last seen at 4:15 p. m. on June 20th. He also gives the names of the employés who were on duty at that time, the defendant not being one of them. He further states that from 5:30 a. m. to 9:30 a. m. on June 21st, the following employés were on duty, with access to such package, if the same was there, namely: Wolfe, Swift, Purpura, Whitehead, and Clement.

⬤⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

M. E. Edson, an employé in the registry division of the Norfolk office, testifying on behalf of the government, states that he was on duty from 1 p. m. to 10:30 p. m. on June 20th, and that it was his duty, when so employed, to see that the registered packages were put in the office safe; that he did not count or check these packages, and that he could only tell that all packages had been placed in the safe by not finding any remaining out; and that he does not recall the package in question at all. All of the above witnesses testified on behalf of the government, and their testimony was the only direct evidence offered by the government as to what actually became of the package on June 20th. This is substantially all the evidence offered by the government as to the physical handling of the package.

However, another investigation was instituted about October 18th, by G. G. Himmelwright, James B. Robertson, John S. Lemen, W. Chambers, and W. D. Kahn. These were well-trained inspectors of long experience. On the morning of the 18th, just as the defendant was entering the post office building in Norfolk, Inspector Kahn, one of the five named, requested Purpura to accompany him to the office of Inspector Himmelwright about 11 o'clock Friday morning, October 18th, and was detained continuously in the presence of these inspectors until the following day at or about the same time. Mr. Himmelwright, testifying for the government, says:

"Q. So for 24 hours he was in charge of post office inspectors? A. I do not know the number of hours, but approximately, yes. I would say from between 11 and 12 o'clock on the morning of the 18th until about the same time the next day. Q. And spent the night with them? A. Yes; with Post Office Inspector Kahn, I think." Inspector Robertson, testifying on behalf of the government, states: "I recollect that distinctly, some time during the afternoon, the boy remarked that he had not had anything to eat; I think he said he had not had his breakfast."

It appears that, in the course of the interview between the inspectors and the defendant on the 18th of October, he made a written statement denying the knowledge of the package, but after making this statement he was not permitted to return home; the reason assigned by the inspectors being that they desired to interview Mr. Casper and his daughter, whose names had been mentioned in the affidavit the defendant had made before the inspectors on the 18th, and that they did not desire him to depart until they could be interviewed. On the early morning of the 19th of October, while the defendant was dressing in the room with Inspector Kahn, which room they had both occupied at the Neddo Hotel, the subject of the package was again brought up by Mr. Kahn, who testified as follows: "In the room, before I left, while we were dressing, I said to Purpura: 'Miss Casper has contradicted every statement practically which you have made in your affidavit to-day, and which puts you in a pretty bad light. While you have denied any gift to her, she has stated to us that you had bought her a ring, a plush dress, suit, and trunk, and various articles of clothing.'"

This conversation took place before breakfast on the morning of the 19th, and the same witness proceeds to testify as follows to the subsequent occurrences: "Q. You had her written statement denying the statements Purpura had made to you? A. Yes, sir. That was about all that was said; that it looks pretty bad; and when we got him in the room we sat possibly 15 minutes, not much more than that. Robertson, Himmelwright, and he and I were there. He asked me to step outside. I stepped out of the door, and a little to the side of the door, and we talked. He first said, 'Can I withdraw that statement I made yesterday?' I said, 'No; you cannot withdraw it, but you can make any additional statement you wish to make.' That was the affidavit he had made before Lemen and Robertson on the 18th. I told him that I was convinced that he had stolen this package, and about this way, and he said, 'Yes; I know I did it; I hate like the devil to admit it.'"

The defendant and the witness then returned to Mr. Himmelwright's office, and the statement which was relied upon by the government was then written out by Inspector Chambers, with various suggestions from Inspector Kahn. Inspector Kahn, in testifying, said: "He showed no objection whatever to writing the statement. He resented nothing that we did." Thus it appears

that the government's case rests upon a statement, not written by the defendant, but by Inspector Chambers, containing suggestions of Inspector Kahn, signed by the defendant, after being detained 24 hours surrounded at all times by one or the other of the inspectors, who were well trained, and was told that it looked very bad for him. He was given to understand by one of the inspectors that he believed he had stolen the package, and the inspector with whom he had to remain during the night had in his pocket a warrant for the defendant's arrest at a convenient time. It is insisted that after an experience of this kind that it was but natural that the young man should succumb to the importunity of these officials.

The defendant himself went on the stand, and went fully into the details and circumstances under which the paper, relied on by the government, was signed by him. It is insisted that in many respects the defendant's testimony is corroborated by that of the government's witnesses. For instance, he states the circumstances under which he went to Mr. Himmelwright's office, the length of time that he remained there, his physical condition owing to lack of food and rest, and the fact that he was required to spend the night in a room with Inspector Kahn, a perfect stranger to him. It is further insisted that he was given no rest during this period, and that the inspectors relentlessly pursued their investigation, and that he endeavored to communicate with his friends for the purpose of employing counsel; that his spending the night at the Neddo Hotel was against his protest; that during this time these inspectors, and especially Inspector Kahn, with whom he spent the night, were continuously telling him that it was best for him to confess to taking the package; that they were confident he had taken it, and that they would be much more lenient with him in the event that he admitted taking the same.

J. L. Broudy and Tazewell Taylor, both of Norfolk, Va., for plaintiff in error.

Hiram M. Smith, U. S. Atty., of Richmond, Va., for the United States.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. It is insisted by the first assignment of error that the court erred in permitting the introduction of the alleged confession. The introduction of this paper was objected to by counsel for defendant, upon the ground that the same was obtained by promises, threats, and coercion, and that it was not voluntary. This assignment presents squarely the question as to whether the alleged confession was competent, in view of the objections urged against the introduction of the same.

It is well settled that, to render a confession admissible, it must clearly appear that it was free and voluntary, and that the witness was not influenced by threats, violence, or by any implied or direct promises—in other words, it should clearly appear that the confession was not due to any improper influence by those seeking to obtain the same. That portion of the Fifth Amendment of the Constitution, which provides that "no person * * * shall be compelled in any criminal case to be a witness against himself," is a safeguard thrown around one who is called upon to answer a criminal charge. When one is arraigned on a criminal charge, the law presumes that he is innocent until the contrary is shown by evidence sufficient to convince the jury beyond a reasonable doubt as to his guilt. Therefore it is highly important in a case like the one at bar that this right should be preserved, and that only confessions should be admitted

where it clearly appears that it was the free act of the defendant, without any inducement, threat or other influence.

In 2 Hawkins, Pleas of the Crown (8th Ed.) p. 595, § 34, there is an admirable statement of the law upon this subject, which is as follows:

"And as the human mind under the pressure of calamity is easily seduced, and liable, in the alarm of danger, to acknowledge indiscriminately a falsehood or a truth, as different agitations may prevail, a confession, whether made upon an official examination or in discourse with private persons, which is obtained from a defendant either by the flattery of hope, or by the impressions of fear, however slightly the emotions may be implanted, is not admissible evidence; for the law will not suffer a prisoner to be made the deluded instrument of his own conviction."

The following from 3 Russell on Crimes (6th Ed.) 478, we think is a clear statement of the record:

"But a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. * * * A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted."

The case of Bram v. United States, 168 U. S. 532, 18 Sup. Ct. 183, 42 L. Ed. 568, is very much in point—indeed, we think it is practically on all fours with the case at bar. There it appears that the defendant, who was the first officer of the ship of which the deceased was the captain, was charged with the murder of the captain on the high seas. The alleged confession was supposed to have been made to a detective at a time when the defendant was under arrest. The detective testified that no threats were made or any inducements held out to him. On this point the witness was interrogated by the court, and testified as follows:

"Q. You say there was no inducement to him in the way of promise or expectation of advantage? A. Not any, your honor.

"Q. Held out? A. Not any, your honor.

"Q. Nor anything said, in the way of suggestion to him that he might suffer if he did not—that it might be worse for him? A. No, sir; not any.

"Q. So far as you were concerned, it was entirely voluntary? A. Voluntary, indeed.

"Q. No influence on your part exerted to persuade him one way or the other? A. None whatever, sir; none whatever."

Thereafter the witness on cross-examination answered the following question, "What did you say to him, and he to you?" to which the witness answered as follows:

"When Mr. Bram came into my office, I said to him: 'Bram, we are trying to unravel this horrible mystery.' I said: 'Your position is rather an awkward one. I have had Brown in this office, and he made a statement that he saw you do the murder.' He said: 'He could not have seen me; where was he?' I said: 'He states he was at the wheel.' 'Well,' he said, 'he could not see me from there.' I said: 'Now, look here, Bram; I am satisfied that you killed the captain from all I have heard from Mr. Brown. But,' I said, 'some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of this horrible crime

on your own shoulders.' He said: 'Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it.' He was rather short in his replies.

"Q. Anything further said by either of you? A. No; there was nothing further said on that occasion."

In that case the Supreme Court said:

" 'The law cannot measure the force of the influence used or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.' In the case before us we find that an influence was exerted, and as any doubt as to whether the confession was voluntary must be determined in favor of the accused, we cannot escape the conclusion that error was committed by the trial court in admitting the confession under the circumstances disclosed by the record."

In the case of Sorenson et al. v. United States, 143 Fed. 820–824, 74 C. C. A. 468, 472, the court said:

"The confessions in the case before this court were made to an inspector while the defendants were prisoners under his control. He stated to one of them that he had an absolutely good case against him, and to both that the thing for them to do was to plead guilty and to throw themselves on the mercy of the court, and the matter would probably be overlooked in the state court. Tried by the decision of the Supreme Court in Bram's Case, either of these statements was 'legally sufficient to engender in the mind of the accused hope or fear in respect of the crime charged,' and each of them rendered the subsequent confession involuntary and inadmissible in evidence."

In this instance, as we have stated, the testimony shows that defendant for a period of almost 24 hours, excluding the time he was asleep, was continuously plied with questions by these five inspectors and all manner of questions propounded to him about the circumstances under which the package in question was lost. It further appears that he was given no rest during this period, except when asleep; that he endeavored to communicate with friends for the purpose of employing counsel, and that he spent the night at the hotel under protest.

Under the circumstances, according to the testimony of the inspectors, we think this alleged confession is clearly inadmissible. This is true, independent of the testimony of the defendant; but in many respects, as we have said, the defendant's testimony is corroborated by that of the inspectors. In view of what we have said, the court below was in error in admitting this alleged confession, and therefore the judgment of the lower court should be reversed.

Reversed.