BOSKET, Plaintiff in error, v. STATE, Defendant in error.

*June 8—July 1, 1966.*

For the plaintiff in error there was a brief and oral argument by *Charles J. Kersten* of Milwaukee.

For the defendant in error the cause was argued by *Robert E. Sutton,* assistant district attorney of Milwaukee county, with whom on the brief were *Bronson C. La Follette,* attorney general, and *Hugh R. O'Connell,* district attorney.

CURRIE, C. J.   At the trial defendant's written confession that he "killed" Hurwitz and Locke was admitted into evidence and Milwaukee police officers were permitted to testify to incriminating statements made to them by defendant after his arrest and while he was in custody. Before this evidence was offered a hearing was conducted by the trial court in the absence of the jury to determine whether the confession and other admissions by defendant were so clearly involuntary as to require that they be excluded. After taking testimony at this hearing the trial court concluded that the confession and other admissions should not be excluded but that the issue of their voluntariness should be submitted to the jury. No special interrogatory was submitted to the jury on voluntariness and the verdicts of guilty of first-degree

murder of course do not disclose how the issue of voluntariness was resolved by the jury.

This manner of handling the issue of voluntariness of a confession or admission by a defendant in a criminal prosecution was in accordance with decisions of this court prior to *State ex rel. Goodchild v. Burke.*[1] However, *Goodchild* determined that this practice had been held unconstitutional by the United States supreme court in *Jackson v. Denno*,[2] and adopted the so-called orthodox rule for determining the voluntariness of confessions and admissions made by the accused. Defendant has raised the issue that no separate determination of voluntariness was made by judge or jury as required by *Jackson v. Denno*. The state concedes that there must be a remand so that the trial court may conduct a hearing on this issue under the rules laid down in *Goodchild*.

Defendant, however, contends that even if such a hearing on the voluntariness of his confession and admissions is held and the trial court should find they were voluntary, an entire new trial nevertheless must be ordered because of other prejudicial errors which occurred during the course of trial. These alleged errors consist of the following:

1. The failure to submit a manslaughter verdict under sec. 940.05 (1), Stats., "without intent to kill and while in the heat of passion," which defendant requested be submitted.

2. Certain evidence offered by defendant to establish the involuntariness of his confession and admissions to police officers was excluded although material on the issue of truthfulness.

---

[1] (1965), 27 Wis. (2d) 244, 133 N. W. (2d) 753. Cases approving the past practice are *State v. Bronston* (1959), 7 Wis. (2d) 627, 97 N. W. (2d) 504, 98 N. W. (2d) 468; *Pollack v. State* (1934), 215 Wis. 200, 253 N. W. 560, 254 N. W. 471.

[2] (1964), 378 U. S. 368, 84 Sup. Ct. 1774, 12 L. Ed. (2d) 908.

3. One of the state's witnesses in his testimony referred to the killing of Hurwitz and Locke by defendant as "murder."

### Failure to submit Manslaughter.

The rule is that there must be a "reasonable ground for a conviction on the lesser charge and an acquittal of the greater charge before the trial court will be justified in submitting lesser degrees of homicide than that charged in the information."[3] If the trial court should have submitted a lesser degree of homicide under the rule stated above, ". . . its failure to do so results in undeniable prejudice to defendant."[4]

Defendant contends that under the facts of the instant case the jury might reasonably conclude that defendant was uncontrollably moved while in the heat of passion and therefore the court committed prejudicial error when it did not submit a verdict of manslaughter grounded on sec. 940.05 (1), Stats., to the jury.

All killing in the heat of passion does not reduce a homicide to the crime of manslaughter set forth in sec. 940.05 (1), Stats. In order to so qualify, the "heat of passion" must have been caused by reasonable, adequate provocation.[5] The standard as to what constitutes reasonable, adequate provocation is not a subjective one but an

---

[3] *Weston v. State* (1965), 28 Wis. (2d) 136, 143, 135 N. W. (2d) 820; *State v. Hoyt* (1964), 21 Wis. (2d) 284, 290, 124 N. W. (2d) 47, 128 N. W. (2d) 645; *Brook v. State* (1963), 21 Wis. (2d) 32, 40, 123 N. W. (2d) 535; *Zenou v. State* (1958), 4 Wis. (2d) 655, 668, 91 N. W. (2d) 208; *State v. Stortecky* (1956), 273 Wis. 362, 369, 77 N. W. (2d) 721.

[4] *Brook v. State, supra,* footnote 3, at page 41; *Weston v. State, supra,* footnote 3, at page 143; *Duthey v. State* (1907), 131 Wis. 178, 182, 111 N. W. 222.

[5] *Weston v. State, supra,* footnote 3, at page 144; *Brook v. State, supra,* footnote 3, at page 42; *Zenou v. State, supra,* footnote 3, at page 666; *State v. Stortecky, supra,* footnote 3, at page 372.

"objective one of whether the provocation would have caused such state of mind in persons ordinarily constituted." [6] In order to apply the objective test of provocation to the facts of this case it is necessary to review the pertinent evidence.

On July 17, 1962, defendant, a twenty-one-year-old Negro, came to Milwaukee with his pregnant wife and six-year-old child looking for work. Defendant had nearly completed high school, and had attended briefly the College of the City of New York and a private school of photography. Thereafter, he worked at a variety of jobs in New York City before traveling west to seek employment. Defendant spent June of 1962 in Chicago, but was only able to find sporadic employment. Defendant testified that when he and his family arrived in Milwaukee he had only $14 and spent $10 of that for a place for his family to stay.

After arriving in Milwaukee defendant commenced looking for employment, but was unsuccessful. Defendant had in his possession at this time obscene pictures which he had obtained while working in a photographic laboratory in New York. Defendant had sold some similar pictures in Chicago "as a last resort, to support myself and my wife and my family." While looking for work in Milwaukee defendant met an individual who told him that one Dave Hurwitz might buy some of defendant's pictures. On July 19th defendant went to Hurwitz's clothing store and tailor shop, showed him the pictures, and Hurwitz said he would buy them for $50. Defendant testified that Hurwitz would not pay him at that time but told him to leave the pictures and come back the next morning. Defendant agreed and testified he then had to sell his coat at a pawnshop for $1 because he "needed to keep seeking work."

---

[6] *Brook v. State, supra,* footnote 3, at page 43. This test has also recently been approved in *Weston v. State, supra,* footnote 3, at page 143, and *State v. Hoyt, supra,* footnote 3, at page 291.

A little after 8 a. m. the next morning, July 20th, defendant returned to the Hurwitz store for the $50. What happened from this point on can be described best in the defendant's own words at the trial:

"I walked into the tailor shop and Dave was in the back, I think, hanging up his coat. And I walked toward the rear and I said, if I'm not mistaken, 'Good morning, Dave.' And he just looked at me. So I said 'Do you have the money for my pictures?' And so he looked at me and—real funny like—and so I asked him again, I said 'Do you have the money for my pictures?'

"And then he asked me 'What pictures, what are you talking about?' And so I said 'The pictures I left with you last night.' So he looked at me and smiled and he said 'You didn't leave any pictures with me last night; I don't have any money for you!' And I said 'But I did leave the pictures with you last night and I want the money for them or I want the pictures back, either one, and I know I left the pictures for you.'

"And then I realized he wasn't kidding and he said 'I got no pictures for you. Get the hell out of my store, you son of a bitch, or I'll call the cops.'

"So I said 'Look, all I want is the money or the pictures, that's all.' So he said 'I tell you, I got no pictures from you, get out of here, get out of here.' And he began to yell and scream. And at that moment I think I leaned over the table to emphasize a point that I had left the pictures with him, and I happened to see my pictures laying next to the cash register. And I became somewhat angry and I walked around the table to get my pictures.

"And Mr. Hurwitz ran towards me and grabbed me and I pushed him out of my way and picked up the pictures and was in the process of putting them in my pocket and he grabbed me again and began to yell and curse, and there was somewhat of a struggle and I pushed him again and he fell down.

"And I tried to walk out of the store and he grabbed my ankle and I tripped, and I was getting up and I think—I guess he beat me up because he pushed me again and I fell against the table, and I don't remember what happened.

"Q. Well, now, when Mr. Hurwitz refused to pay you and said you had not left any pictures and called you

that foul name and threatened to get the police, in what way did that disturb you, or did it upset you?

"*A.* The man was just trying to take advantage of me. I became—I don't know, I felt the blood rush to my head and pounding in my ears and all I could think of was my wife, and something kept running around my head, my wife had told me when I left the house that she was hungry. And I just lost control, I don't remember hurting Mr. Hurwitz, but I guess I must have. . . .

"*A.* I tell you, Mr. Wiener, I just had a feeling—have you ever—something—just everything is going wrong and you grab the first thing you get your hands on and you just throw it, smash it. You can't describe it, it just happens."

There is no dispute in the evidence that defendant stabbed each of the two victims six times with a long-bladed knife. One of the knife wounds to Hurwitz pierced his heart and one of those to Locke pierced the latter's aorta near the heart. Both of these wounds were fatal, death occurring very quickly. Defendant was six feet two inches tall, while the respective heights of Hurwitz and Locke were five feet five inches and five feet six inches. Defendant weighed approximately 175 to 180 pounds while Hurwitz's weight was 140 pounds and that of Locke only 101 pounds. Defendant was twenty-one years of age while Hurwitz was sixty-four and Locke fifty-eight.

Defendant testified that he did not carry a knife into the store on that morning and was not sure where he obtained the knife which he used to kill both men. Detective Russ of the Milwaukee police department testified that defendant told him he picked it up from the counter.

The circumstances surrounding the fatal stabbing of Locke are somewhat confusing. Defendant testified that he did not remember Locke being in the store when he and Hurwitz were arguing, but just remembers a "blur of a figure" coming at him. Detective Russ testified that defendant told him that Locke jumped on his back with

some scissors. This version of what happened was substantially corroborated by Detective James Marx who testified he heard defendant tell Russ that Locke came at him in defense of Hurwitz. One witness said he entered the Hurwitz store about 8:30 on the morning of the 20th, saw two white men and one colored man engaged in an argument, and then left the store only to return shortly thereafter and see defendant running from the store with blood on his shirt.

Before leaving the scene of the crime defendant testified he took two wallets and a coat with him, both wallets containing less than $50.

In the instant case the question is whether the conduct of Hurwitz, coupled with defendant's plight, constituted adequate provocation to cause such heat of passion in persons ordinarily constituted as to cause them to kill without intent to do so. Defendant was obviously a desperate man, so desperate that he reduced himself to attempting to sell obscene pictures to obtain money and sold his coat for $1. The conduct of Hurwitz toward defendant was sufficient to enrage any person. But, even accepting defendant's circumstances, Hurwitz's conduct clearly was not sufficient to cause an ordinary person in those circumstances to become so enraged that he would kill not only Hurwitz, but also Locke who apparently came to Hurwitz's defense. Defendant had so lost control that he seemingly was striking out with the knife at anyone who approached him. As defendant stated in his written confession, he killed these two men for the sole reason that "one tried to take advantage of me by not paying me for pictures I gave him."

That the trial court applied the correct objective standard in determining that manslaughter should not be submitted is clear from the following statement made by the learned trial judge in declining to submit a manslaughter verdict:

"Merely because a person gets into a violent frenzy doesn't get him into a lower degree of homicide, because of his emotional display. If there is no reasonable adequate provocation, then he falls below the ceiling of objectivity as to what an ordinarily constituted man or woman would do under the same or similar circumstances. This isn't the reasonable and adequate provocation of a man ordinarily constituted."

Since the conduct of Hurwitz "does not constitute sufficient provocation to cause such heat of passion in persons ordinarily constituted as to cause them to kill without intent to do so. . . . the trial court did not commit prejudicial error in refusing to submit the lesser offense of manslaughter." [7]

### Exclusion of Proffered Evidence.

Defendant's written confession was given to the Milwaukee police on August 27, 1962, and the admissions testified to by the police witnesses were also made on the same day. The most damaging of these admissions were made while defendant was being transported from the airport to the Safety Building in Milwaukee. Defendant had been held in custody in New York City from August 22d or 23d to August 27th, and on the latter date he was delivered to the custody of two Milwaukee detectives and taken by plane to Milwaukee.

The trial court sustained objections to questions propounded to defendant by his counsel which sought to elicit answers that defendant had been threatened with a pistol, had been knocked down, and had been denied sleep while in FBI custody in New York. Likewise the trial court excluded testimony that, while being transported in a police squad car from the Milwaukee airport to the Safety Building, one of the detectives threatened

[7] *Brook v. State, supra,* footnote 3, at page 43; quoted with approval in *State v. Weston, supra,* footnote 3, at page 144.

to have defendant's wife prosecuted as an accessory after the fact unless defendant gave the police a statement with respect to the killing. After the making of these exclusionary rulings defendant's counsel made offers of proof as to the answers defendant would have given if permitted to answer the questions to which the trial court sustained the state's objections.

Because the voluntariness of defendant's confession and admissions will now be passed upon by the trial court in the hearing to be held pursuant to this court's remand, any error with respect to the issue of voluntariness will be resolved by this new hearing. There remains only the issue of whether such rulings constituted prejudicial error with respect to the issue of the truthfulness of the confession and the admissions made to the police. Such issue as trustworthiness is one for the jury under the orthodox rule we approved in *Goodchild*.[8]

However, defendant testified that what he told the Milwaukee police officers was true, but that some of the things they testified he said were not true. He did not attempt to disavow his short written confession. Thus, according to defendant's own testimony, he did not contend that anything he told the police was untrue because coerced by events which previously had occurred in New York or because of the alleged threat made of prosecuting his wife. The dispute in the evidence related only to whether defendant's version of what he stated to the officers, or their version thereof, was true. Therefore, what occurred in New York and the alleged threat to prosecute defendant's wife had no materiality on the issue of the truthfulness of the confession and defendant's admissions, and we find no error in such rulings as limited to this issue. We might add that there was very little discrepancy between defendant's testimony of what occurred on the morning of the killing and what the police witnesses testified defendant had told them.

---

[8] *Supra,* footnote 1.

This excluded testimony, however, should be admitted at the hearing the trial court is to conduct on our remand with respect to the issue of voluntariness. If the Milwaukee police did threaten to prosecute defendant's wife as an accessory after the fact such threat is of a nature which could be coercive in inducing defendant to give the police a statement.[9]

### Witness' Use of the Word "Murder."

The last error claimed by defendant relates to the use of the word "murder" in two instances by Detective Russ who testified for the state.

The first of these two instances is best set forth by quoting the following extract from the record:

"*Q.* What occurred in that room? *A.* At approximately 8:40 p. m. Willie Bosket wrote a handwritten statement, admitting the murder of Dave Hurwitz—
"*Mr. Wiener:* Just a moment, I move that be stricken as a conclusion.
"*The Court:* Yes, the word 'admitting' is stricken. 'Wrote a handwritten statement' may stand. Strike 'admitting' as a conclusion. Motion granted, objection sustained."

The second instance occurred at a later point in the testimony of this witness when he was relating what transpired when defendant and the witness were conversing during the plane trip from New York to Milwaukee. Russ testified "Mr. Bosket had started asking me other questions about the incident that had occurred,

---

[9] See *Lynumn v. Illinois* (1963), 372 U. S. 528, 83 Sup. Ct. 917, 9 L. Ed. (2d) 922 (accused would be disentitled to public assistance (ADC) and would lose custody of her child); in *Rogers v. Richmond* (1961), 365 U. S. 534, 81 Sup. Ct. 735, 5 L. Ed. (2d) 760 (to take accused's wife into custody); cf. *Phillips v. State* (1966), 29 Wis. (2d) 521, 530, 531, 139 N. W. (2d) 41.

the murders in Milwaukee." Defendant's counsel voiced no objection to this testimony nor did he ask that it be stricken and the jury instructed to disregard it.

Thus in the first instance defendant's counsel objected and secured the striking of the objectionable portion of the answer. In the second instance defendant's counsel did nothing to remedy the situation. Furthermore, the word "murder" is ambiguous in the context used in the second incident because it either might be a direct quotation of the word used by defendant or it could be merely the witness' paraphrasing of defendant's language.

We find no prejudicial error with respect to these two incidents. Additionally with respect to the second incident, "it is one of the most elementary rules of evidence that an objection must be made as soon as the opponent might reasonably be aware of the objectionable nature of the testimony . . . ." [10] Defendant's counsel by not objecting at the time to the use of the word "murder" failed to preserve defendant's right to raise this issue now.

### Proceedings to be had on Remand.

On remand of the cause to the circuit court, that court is to conduct a hearing on the issue of the voluntariness of defendant's written confession and admissions to the Milwaukee police officers, and shall make proper findings of fact. If the circuit court shall find and determine that the confession was voluntarily made by defendant, no further action will be necessary on the part of that court. However, should the circuit court find and determine that the confession or admissions, or any of them, were

[10] *Collier v. State* (1966), 30 Wis. (2d) 101, 104, 140 N. W. (2d) 252; see also *Ferry v. State* (1954), 266 Wis. 508, 510, 63 N. W. (2d) 741; *State v. Henderson* (1937), 226 Wis. 154, 163, 274 N. W. (2d) 266.

involuntarily made by defendant, the circuit court is directed to vacate and set aside the judgments of conviction and sentence, and grant a new trial.

*By the Court.*—The cause is remanded to the circuit court for further proceedings in accordance with this opinion.